IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LANITHA O'NEAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13 C 5029 |
| ) | |
| HALEY MANSION, INC. and ) | |
| JEFFREY BUSSEAN, individually, ) | |
| ) | |
| Defendants. ) | |

# **MEMORANDUM OPINION AND ORDER**[1]

Following this Court's June 22, 2015 approval (with some modifications) of the proposed final pretrial order ("FPTO") that had been prepared and tendered jointly by counsel for the litigants,[2] they have complied with the timetable for motions in limine that this Court set at the pretrial conference that it always conducts in connection with proposed FPTOs. Each side has filed its motions in limine and its responses to the other side's motions, so that the issues have been teed up for resolution.

But before this opinion turns to that task, the pervasive prevalence of hearsay objections and related evidentiary considerations among the grounds advanced by the litigants in those motions calls for some preliminary discussion. That has been prompted in substantial part by a

---

[1] See Appendix.

[2] Although the parties' draft FPTO was basically approved during the June 22 conference, the modifications requested by this Court at that time were later made and submitted by counsel in an Amended FPTO. This Court has reviewed that Amended FPTO in conjunction with its consideration of the parties' motions in limine, so that it has approved and entered that revised version (except for the parties' recommendation for a 12-person jury) on September 21, 2015 nunc pro tunc June 22.

wholly fortuitous circumstance that came about just as the motions in limine were nearing the top echelon in priority in this Court's pending motion list in cases assigned to its calendar, so that some background explanation is in order.

First a bit of history. This Court had the good fortune to be chosen, totally out of the blue, as a member of the federal Judicial Conference's Advisory Committee on the Rules of Evidence when then Chief Justice Rehnquist reconstituted that committee in 1993 after it had been out of existence for some two decades. During that hiatus there had been no central body designated (1) to serve as a clearing house for suggested modifications of those Rules or (2) to study and consider possible modifications on its own. Instead development of the law in that area had been primarily dependent on suggestions or proposals coming from sources such as the Advisory Committees on the Rules of Civil Procedure or of Criminal Procedure or of Appellate Procedure as the collateral result of the substantive work of those committees that might chance to implicate rules of evidence that appeared to call for attention.

Work on the newly reconstituted Advisory Committee was, as could have been expected, extraordinarily rewarding. Needless to say, that experience was greatly enhanced for this Court when its work on the Committee eventuated in its being appointed as its chairman after having completed what Chief Justice Rehnquist had established as a six-year maximum of service by any judge on all advisory committees -- a rule intended to allow greater opportunities for service on the part of the entire federal judiciary (prior practice had permitted prolonged service, so that some judges had become pretty much permanent fixtures on advisory committees).

All of this is prelude to the fact that the Advisory Committee on the Rules of Evidence was scheduled to meet in Chicago on October 9 of this year for a symposium devoted to hearsay reform, and this Court was invited to attend that symposium and to participate in the in-house

meeting of the Committee that followed on the same day. That invitation, which came at the instance of Fordham Law School Professor Daniel Capra, who had been the invaluable Reporter to the Committee during this Court's tenure as a member and then Chairman and who still serves in that capacity, triggered a responsive suggestion by this Court as to a possible basic reform in that and related areas that bears importantly on the issues posed by the motions in limine advanced in this case by the parties' counsel (primarily but not exclusively by defense counsel).

Anyone who has devoted thought and study to the subject of hearsay understands that its antecedents are rooted in history, so that the Fed. R. Evid. ("Evid. Rule") 803 and 804 laundry lists of exceptions to the Evid. Rule 801(c) definition of "hearsay" have developed from the recognition that a literal application of that definition as a total bar on admissibility into evidence makes no sense in many situations. Oliver Wendell Holmes had it right nearly a century and a quarter ago when he wrote in his article "The Path of the Law," published in 10 Harv. L. Rev. 457, 469 (1897):

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Unsurprisingly, then, the first scheduled topic at the October 9 symposium on hearsay reform was "Using an Expanded Residual Exception in Place of Certain Standard Hearsay Exceptions." And the first scheduled speaker on that topic was Judge Richard Posner of our own Court of Appeals, slated to talk about "eliminating some standard hearsay exceptions and expanding a case-by-case trustworthiness approach to hearsay." In that respect it is well worth reading Judge Posner's concurring opinion in United States v. Boyce, 742 F.3d 792, 799-802 (7th Cir. 2014), which exposed what he characterized as the dubious credentials of a couple of the

hearsay exceptions in a sort of "the Emperor has no clothes" demonstration and, after an extended exposition, concluded (id. at 802):

> What I would like to see is Rule 807 ("Residual Exception") swallow much of Rules 801 through 806 and thus many of the exclusions from evidence, exceptions to the exclusions, and notes of the Advisory Committee. The "hearsay rule" is too complex, as well as being archaic. Trials would go better with a simpler rule, the core of which would be the proposition (essentially a simplification of Rule 807) that hearsay evidence should be admissible when it is reliable, when the jury can understand its strengths and limitations, and when it will materially enhance the likelihood of a correct outcome.

If that view is regarded as heretical, this Court joins in that heresy.[3] Most importantly, an actual change in the "hearsay rule" as such -- something that would require a great deal of time and effort, as what follows will explain -- is not needed to deal with the motions in this case (a subject that this opinion will address after the ensuing explanation).

First, though, to the promised explanation. Under the multistage procedure for adopting any amendment to any of the Federal Rules, several years necessarily elapse between the initial proposal of any amendment by one of the Advisory Committees and the ultimate date when that amendment takes effect, something that takes place only after (1) its having been approved by the United States Supreme Court by May 1 of a particular year based on a recommendation by the Standing Committee on Rules of Practice and Procedure and (2) its then not having been rejected by Congress by December 1 in that same year (this Court has sometimes characterized that extended multiyear timetable, in a considerable understatement, by referring to the gestation

_____

[3] Judge Posner's criticism in his Boyce opinion of what he labeled as two analytically unjustified exceptions included in Evid. Rule 803's laundry list was itself criticized by several other participants in the symposium and the ensuing Advisory Committee meeting. This opinion should not be misunderstood as staking out a position on either side of that debate -- a step that need not be taken in ruling on the present motion. Instead it subscribes to the general principle articulated in the above-quoted excerpt from Judge Posner's opinion in Boyce.

period of the elephant). Thus even though the residual exception to the hearsay rule was moved to a new Evid. Rule 807 in 1997 (while this Court was a member of the Advisory Committee), by then it had been percolating for several years during the several stages that necessarily precede the effective date of adoption of any Rule amendment. Although the brief Advisory Committee note that accompanied the 1997 shift in the placement of the residual exception stated that no change in meaning was intended, both at that time and today (the latter being best evidenced,[4] as already stated, by the October 9 symposium and meeting) there has been a general consensus that some reform is needed in this area.

As was always the case during this Court's tenure on the Advisory Committee, and as remains true today, the discussion among the symposium participants on the subject of hearsay reform -- and the ensuing discussion among the Advisory Committee members during its afternoon session that followed the symposium -- was vigorous and reflected varying views, including some criticism (as already mentioned in n.2) of the examples chosen by Judge Posner in his Boyce concurrence. But those differences of view were overshadowed by the unanimity of opinion that reform was indeed called for and that it should take the form of an expanded role for the residual exception (discussed hereafter) to the conventional historical structure exemplified by Evid. Rules 803 through 806.

All of that said, this opinion returns to the specifics of this case, which in this Court's view illustrates the appropriateness of one other refinement of the requirement of trustworthiness that is an essential component of the residual exception now embodied in Evid. Rule 807. For the most part the Rules of Evidence are applicable to civil and criminal cases alike, even though

---

[4] Bad pun intended.

as a matter of principle the purposes underlying both the exclusion of hearsay evidence and the limited exceptions to such exclusion have much greater force in criminal cases. There a defendant's liberty is at stake, so that the law properly leans over backward to avoid any potential for jurors finding a defendant to have been proved guilty beyond a reasonable doubt on a current charge based even in part on the jury's knowledge that the defendant once before (or more than once before) has been found guilty of some other crime.

In the real world, of course, many decisions -- and entirely reliable ones -- are reached by all of us on the basis of hearsay information. That life experience is typically based on a common-sense judgment as to the reliability of that information. Here, as the ensuing analysis reflects, a critical issue in this action is the reliability of statements that various witnesses attribute to defendant Jeffrey Bussean ("Bussean"), the owner of his codefendant Haley Mansion, Inc. ("Haley Mansion"), that could reasonably lead a factfinding jury to conclude that Bussean is a bigoted person whose mindset in that respect led him to discriminate against plaintiff Lanitha O'Neal ("O'Neal") because she is an African-American. Although some of the contexts in which such asserted statements would have to be put before the jury might perhaps cause those statements to be excluded appropriately from a criminal trial in which Bussean was facing charges of that nature, it is less clear that a jury's attribution of the claimed statements to Bussean, even though "not specifically covered by a hearsay exception in Rule 803 or 804" (Evid. Rule 807(a)), should be precluded in this civil action if the jury determines that those statements have appropriate guaranties of trustworthiness. That possibility and the requisite cautionary jury instructions on that score will be addressed later, when the motions in limine are discussed in detail.

With all of that said by way of background and perspective, this opinion turns to the parties' motions in limine. Once again, as already indicated, those motions based on hearsay challenges will frequently be viewed through the lens provided by the Evid. Rule. 807 residual exception, tempered as appropriate to take account of more particularized exceptions. Plaintiff O'Neal's motions will be dealt with first, with the Haley Mansion-Bussean motions to be ruled on thereafter (again see the Appendix). As a matter of convenience, the subject matter of each motion will be identified here in general terms rather than in detail -- for a full characterization of that subject matter, the parties and any other readers should resort to the motions themselves.

### O'Neal's Motions in Limine

O'Neal's Motion No. 1 (Dkt. No. 45), which seeks to bar all non-party witnesses from the courtroom while they are not testifying, is unopposed by defendants -- indeed, the same motion was made by Haley Mansion and Bussean as their Motion No. 4. Accordingly both motions are granted. As a suggestion, however, counsel for the parties might wish to discuss whether they want to enter into a frequently-agreed-upon variant on such motions, in which a witness may return to the courtroom after having testified and with no prospect of being recalled later.

O'Neal's Motion No. 2 (Dkt. No. 46) stems from the Bussean-Haley Mansion desire to introduce evidence as to Bussean's asserted good treatment of a different African-American employee (Austin MacDowells, referred to as "Mack") for a period that began 30 years ago (when Bussean himself was just 30 years old) as a basis for countering O'Neal's current portrayal of him in racist terms. But on that score both the defendants and defense counsel display a total misconception of what this lawsuit is about. It is not simply that O'Neal, an African-American, is black in color. It is rather that the offense ascribed to defendants and portrayed in the testimony by present and past employees of Haley Mansion as occurring during O'Neal's

- 7 -

employment there is that of preventing her -- because she would be both black <u>and</u> <u>visible</u> -- from working in the upper level bar (referred to in this opinion, for convenience, as the "Main Bar"), which is patronized and populated by what Bussean regards as his high-class clientele (not so incidentally on that score, note the establishment's self-described designation as the "<u>Haley Mansion</u>").

That vital distinction, which both Bussean and his corporation share (and which is propagated as well by his counsel), is confirmed by their willingness to have O'Neal ply her trade as a bartender and mixologist (note that no fault whatever was ascribed to O'Neal's qualifications and work during her employment at Haley Mansion), but only at the lower-level facility referred to here for convenience as the "Service Bar," out of the sight of the members of the public who comprise the Haley Mansion's patrons. That being so, (1) <u>her</u> "customers" were the members of the wait staff who served at the upper level Main Bar and (2) her compensation depended in material part on the extent to which those wait staff members might opt to share their tips with her, rather than her having direct contact with (and therefore, as she claims, receiving much larger tips from) the patrons themselves. And that is the real dispute at issue here: not simply the fact of O'Neal's being African-American and black, but the consequent mindset ascribed to Bussean -- a mindset as to which Evid. Rule 404(b)(2) provides for the admissibility of his character or character-trait evidence to show his motive or intent in opposing O'Neal's working at the Main Bar.

Although this discussion of a single motion in limine has been more elaborate than might perhaps have been expected, it has been entirely appropriate because -- as indicated above -- the distorted mischaracterization of O'Neal's claim in this action so permeates the Bussean-Haley Mansion presentations. But to return to O'Neal's Motion No. 2 specifically, the proposed

evidence to which she objects is not only extraordinarily remote in time but is really irrelevant as well.[5]  In short, O'Neal Motion No. 2 (Dkt. No. 46) is granted.

O'Neal's Motion No. 3 (Dkt. No. 47) seeks to bar testimony and evidence as to her "knowledge of bartending and questions concerning the recipe and method of making various mixed alcoholic drinks."  That attempt to muddy up O'Neal in terms of what she does or does not remember <u>now</u>, when she has been away from that line of work for several years, is really offensive (remember that her employment by defendants was in the period between October 2007 and June 2010, and her June 2014 deposition reflects that she had continuously thereafter worked at schools as a bookkeeper and in related business activities [now working as a "business assistant"] -- <u>not</u> at mixing drinks (Dep. 52:17-55:22)).  Defendants and their counsel choose to ignore (1) that in response to O'Neal's Request To Admit they confirmed that she was hired as a bartender and (2) that during her employment she was never given any write-up or any negative performance review -- instead defendants have acknowledged in their unsuccessful summary judgment attempt (at page 9 of their Feb. 18, 2015 supporting memorandum, Dkt. No. 27) that "there is no dispute that between the beginning of her employment in October 2007 up until

---

[5] It will be remembered that O'Neal must prove adverse employment decisions motivated by statutorily-barred discriminatory intent, with the proof of that prohibited intent bearing a close temporal relationship to the complained-of adverse employment decision.  This opinion need not elaborate on the very different facts involved in the acquisition of a business 30 years ago in which one of the employees of the seller (African-American chef "Mack") was retained on the payroll.  In that era before the advent of the superstar chef who is very much in the public eye, "Mack" was simply an African-American employee whose work would not regularly bring him into direct contact with the acquired establishment's clientele.  Moreover, the defense effort to offer evidence of the retention of "Mack" as an employee and of the benefits provided to him and his wife during his illness and after his death (though the precise dates are not critical, that appears to have occurred somewhere in the 15-to-20-year-ago range) runs afoul of Evid. Rule 404(a) and, even if it were relevant (as it is not), would offend Evid. Rule 403 as well.

June 18, 2010, the plaintiff did perform her job satisfactorily." And once again remember that the objections that have been ascribed to Bussean related solely to <u>where</u> O'Neal was to work and not <u>how</u> she worked.

Under the circumstances, the Bussean-Haley Mansion effort on this score is really troubling. Even if the challenged evidence were relevant to the dispute in this case (and it plainly is not), there is no question that it should be barred in terms of the balancing called for by Evid. Rule 403. O'Neal's Motion No. 3 (Dkt. No. 47) is also granted.

O'Neal's Motion No. 4 (Dkt. No. 48) seeks to bar testimony and evidence regarding her interactions with Bussean's young son (then some 12 years old), whom Bussean would sometimes would bring to the Haley Mansion. At Bussean's Dep. 252:3-5 he testified:

> I thought that she [O'Neal] was a darling girl, the way that she really treated my son . . . .

Again what this opinion has described at length in connection with O'Neal's Motion No. 2 applies here with equal force. It is enough to say that Bussean's conduct in permitting some interaction between O'Neal and his son has no relationship at all to the subject at issue in this litigation -- O'Neal's required invisibility in terms of the more lucrative work at the upper-level Main Bar, which involves direct service to the guests at the Haley Mansion. Essentially for the same reasons as have been stated regarding O'Neal's Motion No. 2, her Motion No. 4 (Dkt. No. 48) is also granted.

O'Neal's Motion No. 5 (Dkt. No. 49) poses a number of objections to what are contended to be irrelevant and unduly prejudicial areas of questioning that could be posed to expected witness Linda Weiss ("Weiss"). Because the motion identifies four assertedly problematic subjects, they will be dealt with here separately.

First, defendants agree that a screenplay written by Weiss "has no relevance to the present matter," so they do not object to the exclusion of that subject from her cross-examination at trial. Although that concession is tempered somewhat by defendants' conjecture that some aspect of her testimony may cause the screenplay to become fair game for impeachment purposes, it is unnecessary to deal with that hypothetical possibility at this point.

Second of the objected-to subjects is Weiss' "former friendship with Defendant and Haley Mansion owner Jeffrey Bussean." On that score the defense response is that the timing and circumstances of that prior relationship in relation to the time when Weiss spoke with O'Neal, informing her about Bussean's assertedly race-based comments and conduct, may bear on Weiss' possible bias and consequently on her credibility. In those terms this Court cannot make a present ruling, but the litigants are urged to provide more input on the subject well in advance of the trial so as to avoid possible interruptions at that point based on how the issue unfolds.

O'Neal's third potential exclusion regarding Weiss' testimony is to evidence relating to "Bussean's former assistance to Ms. Weiss to help pay her bills, including health insurance and rent." Here too the defense response adverts to a portion of that subject as potentially relevant in terms of asserted bias and a consequent credibility issue. That issue then stands on the same footing as the one discussed in the preceding paragraph.

Finally O'Neal seeks to bar evidence as to "Ms. Weiss's non-chef work for Bussean and her no longer pending lawsuit against defendants." On that score defendants respond that both the non-chef work and the content of the former lawsuit by Weiss are "not relevant to this matter," but they go on to assert that the filing of the lawsuit (as contrasted with its content) is relevant under Evid. Rule 401 and not excludable under Evid. Rule 403.

That, however, is too simplistic, for being told of the fact of a lawsuit by Weiss without any indication of its content would not suffice to give the jury an adequate basis for evaluating the possibility of bias and hence of a lack of credibility on Weiss' part -- and here the content of her complaint against Bussean would carry the strong prospect of digressing into unsavory matters regarding him. This Court has no inclination to turn this lawsuit into a general probe of Bussean's character or asserted lack of character. With Weiss' lawsuit having been voluntarily dismissed (another subject that could call for exploration and further digression from the merits of this litgation), this entire subject would be best left untouched, with the evidence as to Weiss' arguable bias left to the earlier-discussed subjects. This Court so orders.

In short, O'Neal's Motion No. 5 (Dkt. No. 49) is granted in part and denied in part at this time. It will be reexamined in advance of, or at the time of, trial as may be appropriate.

O'Neal's Motion No. 6 (Dkt. No. 50) seeks to bar a number of witnesses on defendants' "will call" list in the FPTO who are asserted not to have any personal knowledge of this case -- those witnesses being Lori Franze, Donna Quinlan, Nick Ulatowski and Sarita Worley and, to a limited extent, Jan Oldham. As O'Neal puts it:

> All of these declarations (including at least two from women who have been romantically and/or sexually involved with Bussean) have nothing to do with the issues in this case; rather, their sole purpose is an attempt to establish Bussean's allegedly good character.

Defendants' response relies in part on their earlier-discredited position on O'Neal's Motion No. 2, asserting unpersuasively that O'Neal "wants to have her cake and eat it too." Defendants' other arguments are equally unpersuasive, for this Court is not converting this action into a swearing contest as to Bussean's character or lack of character. Evidence adverse to Bussean on the case's issues as correctly understood (and not the distorted perspective that

defendants have brought to the matter) do not create a two-way open season on character evidence regarding Bussean.

O'Neal's motion provides a detailed and compelling explanation as to the exclusion of the testimony of each of the challenged witnesses other than a limited area as to Jan Oldham ("Oldham"), with defendants' proffered justification not making a dent in O'Neal's position. As to Oldham, her declaration tendered as part of defendants' response refers to a conversation she had with O'Neal on the latter's last day of employment. O'Neal's counsel has indicated that O'Neal intends to testify as to that conversation, and understandably (and properly) counsel interposes no objection to Oldham's testifying on that subject. Hence O'Neal's Motion No. 6 (Dkt. No. 50) is granted with that limited exception.

O'Neal's Motion No. 7 (Dkt. No. 51) poses a brief predicate for barring testimony or evidence as to O'Neal's mitigation of, or failure to mitigate, her claimed damages. On that score O'Neal's counsel points to defendants' failure to plead an asserted affirmative defense in that respect, resulting in the waiver or forfeiture of that affirmative defense.[6]

When it comes to mitigation issues, a defendant cannot be faulted for not raising that issue in its answer, for at that time the underlying evidence has not been explored to the extent that a defendant can raise that factual issue at the outset. But in this instance it was not until June 16 of this year -- just a bit short of two years after the lawsuit was filed and, more importantly, just under a half year after discovery was closed -- that defendants sought leave to

_____

[6] Even though the term "waiver" is often attached to the type of argument advanced by O'Neal, that label is of course inaccurate, for the term "waiver" connotes the voluntary giving up of a possible defense. "Forfeiture" is the right term to use, for that concept is predicated on a party's loss of a possible contention on legal grounds -- the failure to advance that contention at the time that it should have been put forward.

file that and other putative affirmative defenses. That motion was denied a week later, with defendants being barred from asserting those requested affirmative defenses.

Under those circumstances defendants will not be permitted to back door the issue of claimed non-mitigation by raising it now -- see, e.g., Kensington Rock Island Ltd. P'ship v. Am. Eagle Historic Partners, 921 F.2d 122, 125 (7th Cir. 1990) and United States EEOC v. Gurnee Inn Corp., 914 F.2d 815, 818 (7th Cir. 1990). By way of response defense counsel seeks to advance Carter v. United States, 333 F.3d 791, 796 (7th Cir. 2003), but that case spoke to the effect of failure to plead an affirmative defense in the Answer -- as stated earlier, a time when the defendant almost never has the facts in hand and the assertion of a failure to mitigate would be nothing more than a totally hypothetical preview of possible coming attractions. Accordingly O'Neal's Motion No. 7 (Dkt. No. 51) is granted as well.

O'Neal's Motion No. 8 (Dkt. No. 52) seeks to bar still another potential affirmative defense that was not raised until defendants includes the following contention in their June 16, 2015 motion seeking belated leave to file new affirmative defenses:

> Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities in Defendant, Haley Mansion, Inc.'s Employee Handbook.

As stated earlier, this Court promptly rejected that belated motion. And the rejection of defendants' attempt to reassert that defense at this point really follows a fortiori from what has just been said as to O'Neal's Motion No. 7. To permit them to reraise this issue, well after discovery had been closed and after defendants had launched and lost (via oral ruling) a motion for summary judgment, would plainly be grossly prejudicial. Here defense counsel's attempted reliance on the earlier-cited Carter decision is patently impermissible, and O'Neal's Motion No. 8 (Dkt. No. 52) is granted too.

O'Neal's Motion No. 9 (Dkt. No. 53) seeks to bar argument or testimony as to the elements of a hostile work environment claim or a claim of racial harassment. Once again defense counsel's response misses the mark, for it is born of counsel's misunderstanding -- hard to understand, given how long and how intensely the parties have been at it in this action -- as to the nature of O'Neal's lawsuit.

This opinion has already spoken at some length on that subject, but on the present topic it is indeed plain that O'Neal is not advancing the typical hostile work environment claim that asserts the existence of a work climate that the claimed victim of employment discrimination finds impossible to bear. By contrast, O'Neal's claims here urge that she suffered disparate treatment in her work assignment and sustained consequent damages -- but Bussean is not alleged to have communicated his asserted mindset to O'Neal or to have made her working conditions intolerable in the sense characteristic of hostile work environment claims (see pages 162 through 165 of O'Neal's deposition, which apparently seemed to defense counsel to support their position but really do not). Hence O'Neal's Motion No. 9 (Dkt. No. 53) is granted as well.

O'Neal's Motion No. 10 (Dkt. No. 54) targets the submission of any proposed evidence as to her failure to report her tips on her tax returns -- as defendants' response puts it, that failure "calls into question the plaintiff's character and credibility," assertedly bringing Evid. R. 608 into play. Importantly, that contention ignores the reason for the 2003 amendment to Evid. R. 608(b), adopted pursuant to the recommendation of the Judicial Conference's Advisory Committee on the Rules of Evidence during this Court's tenure as its Chairman. As Stephen Saltzburg, Michael Martin and Daniel Capra, <u>Federal Rules of Evidence Manual</u> § 608.02[8] (10th ed. 2011) puts it as part of that treatise's excellent treatment of Evid. R. 608, that amendment's alteration of Evid.

R. 608(b) "simply substituted the correct term 'character for truthfulness' for the overbroad term 'credibility'" in that Rule's original bar of extrinsic evidence offered "for the purpose of attacking or supporting the witness' credibility." What defendants really seek to do here is muddy up the waters as though that change in emphasis had not taken place -- they want to introduce "other acts" evidence that falls within the prohibition set out in Evid. R. 404(b)(1).

O'Neal advances a number of reasons for exclusion of that evidence, far more cogent than defendants' weak response. Indeed, even apart from O'Neal's multiple specific reasons for precluding such evidence, the balancing test prescribed by Evid. R. 403 -- which looks to the dangers of unfair prejudice, confusion of the issues and misleading the jury, all of which substantially outweigh any probative value in this case (even if the evidence were deemed relevant, which is questionable) -- call for granting O'Neal's Motion No. 10, and this Court does so.

O'Neal's Motion No. 11 (Dkt. No. 55) asks this Court "To Bar Evidence of the Failure of Third Party Witnesses to Appear for Depositions." Those third party witnesses are two former Haley Mansion managers (Jennifer Roake ("Roake") and Jullya Molburg ("Molburg")) and former Haley Mansion employee Melanie Valentino). Defendants' retort is nothing more than a 10-line ipse dixit that concludes:

> As such, these third party witnesses refusal to appear for the depositions is relevant pursuant to Fed. R. Evid. 401.

But neither O'Neal nor defendants control those third party witnesses, and nothing (including defendants' ipse dixit assertion) even suggests that O'Neal or her counsel had anything to do with the witnesses' nonappearance. If as defendants assert those witnesses are biased against them, defendants are free to subpoena them for trial for possible cross-examination to

counter the evidence O'Neal may offer (in that respect, Ex. A to Motion No. 11 is a declaration by Roake under penalty of perjury, and Ex. B is a portion of a deposition by Molburg in a state court lawsuit that defendants had filed against her).

In short, the fact that those prospective witnesses failed to appear in response to subpoenas issued by defendants during discovery is a non-starter in terms of barring their testimony if they respond to trial subpoenas. Hence O'Neal's Motion No. 11 is also granted.

Finally, O'Neal's Motion No. 12 (Dkt. No. 58) is a grab bag assortment of O'Neal's objections to a substantial set of defendants' exhibits, a collection that calls for a good deal of individual treatment and that also interacts in a number of instances with defendants' Amended Motions in Limine (collectively grouped in a single document, Dkt. No. 59). For the reason explained in the Appendix to this opinion, treatment of that motion is deferred.

## **CONCLUSION**

For the reasons stated in this lengthy opinion, this Court has issued the following rulings on plaintiff O'Neal's motions in limine:

1. Motion Nos. 1 (Dkt. No. 45),[7] 2 (Dkt. No. 46), 3 (Dkt. No. 47), 4 (Dkt. No. 48), 7 (Dkt. No. 51), 8 (Dkt. No. 52), 9 (Dkt. No. 53), 10 (Dkt. No. 54) and 11 (Dkt. No. 55) are granted.

2. Motion No. 5 (Dkt. No. 49) is granted in part and denied in part, with some of its aspects to be reexamined in advance of, or at the time of, trial as may be appropriate.

3. Motion No. 6 (Dkt. No. 50) is granted with a single limited exception.

---

[7] That grant of O'Neal's Motion No. 1 is coupled with granting defendants' Motion No. 4.

This Court defers its ruling on O'Neal's Motion No. 12 (Dkt. No. 58) and all other aspects of defendants' motions (all of which are set out in a single document, (Dkt. No. 59).

*[signature: Milton I. Shadur]*

Milton I. Shadur
Senior United States District Judge

Date: November 23, 2015

**APPENDIX**

This opinion has regrettably been long delayed by a combination of (1) numerous pressing and time-sensitive demands on this Court in other cases on its calendar (this Court has frequently commented that the most limited resource in the federal justice system is a judge's time) and (2) the extraordinarily large number of motions in limine advanced by both parties in this case, many of which pose issues of substantial complexity. One consequence of those combined factors is that this Court's efforts to return to dealing with the parties' motions have been compelled to take place in fits and starts, an enemy to prompt and efficient treatment.

As chance would have it, just as this Court was approaching the completion of its ruling on plaintiff O'Neal's motions in limine (with only the last of those, her Motion No. 12, remaining to be dealt with), it received notification that a new defense counsel was coming in to substitute for defendants' prior counsel on December 1. That has led to the unusual step (certainly unique for this Court) of ruling on O'Neal's motions in this opinion but deferring the rest of the task (which comprises the addressing of O'Neal's last motion and all of defendants' motions) pending the prompt scheduling of a conference with O'Neal's counsel and defendants' new lawyer.